REINDL, Respondent v. OPITZ, Appellant

(217 N.W.2d 873)

(File No. 11272. Opinion filed May 15, 1974)

Ronald E. Clabaugh, of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for plaintiff and respondent.

Donald R. Shultz of Lynn, Jackson, Shultz, Ireland & Lebrun, Rapid City, for defendant and appellant.

WOLLMAN, Justice.

Plaintiff was awarded $36,000 by a jury in her action for personal injuries. Defendant appeals from the judgment, claiming that the verdict is excessive.

At approximately 1 a. m. on April 27, 1971, plaintiff's automobile was struck from the rear by defendant's automobile as plaintiff was stopped at an intersection in Rapid City, South Dakota. The force of the impact tore the front seat of plaintiff's automobile loose from the floorboard and pushed the automobile diagonally across the intersection, over a concrete dividing island and up over the curb.*

Plaintiff was examined at the emergency room at one of the local hospitals shortly after the accident and then returned to her home. When she arose later that morning she had difficulty in moving because of stiffness in her neck and upper back. She was examined later that day by her family physician, who took some x-rays and diagnosed her injury as a severe neck sprain. He prescribed some muscle relaxant drugs and advised plaintiff to use heat treatment. Plaintiff continued to suffer pain and discomfort, including the headache that had persisted from the time of the accident as well as a burning pain across her shoulders and upper back; in addition, she was unable to raise her arms or turn her head. On April 30, 1971, plaintiff was admitted to a local hospital, where she remained until May 10, 1971. During this time she was in traction and also received some diathermy treatments. Because plaintiff's condition did not improve, her doctor called in for consultation Dr. Conrad Blunck, an orthopedic surgeon. Dr. Blunck diagnosed plaintiff's injury as a neck sprain, moderately severe, and recommended that she be given more pain-killing drugs· than she had been receiving and that she continue with the traction treatment.

---

* Defendant filed an amended answer on the day of trial in which he admitted liability. He offered no evidence.

After being discharged from the hospital on May 10, plaintiff wore a cervical collar constantly for a period of some two months. She also took medication to relax her muscles and to relieve her pain.

Plaintiff was 19 years old on the date of the accident. She had enrolled at the South Dakota School of Mines and Technology in the fall of 1970, intending to major in geological engineering. At the time she was injured she was maintaining a C+ average in her course work. Because of the fact that she had missed a number of classes as a result of the injury she suffered in the accident and because the medication she was taking after her release from the hospital affected her memory, plaintiff decided that she would have to withdraw from school. She received a "withdraw passing" in all of her courses except for a chemistry course which she was auditing the second semester, having completed all of the first semester work except for the final examination. Because she was unable to take the examination at the end of the spring semester, plaintiff received an "F" in this four-hour course, which had the effect of dropping her grade point average substantially.

In addition to being a full-time student on the date of the accident, plaintiff was also working part time at two restaurants in Rapid City. Plaintiff had started working part time during the school year while she was still in high school and worked full time during the summer months.

Plaintiff worked for a life insurance company for one week in August of 1971. Her back caused her a good deal of discomfort and she was unable to cope with the work. Plaintiff worked as a waitress in a restaurant in Custer, South Dakota, from September until November of 1971. During this time she spent two days in a hospital in Custer because of a bad headache and because of stiff and sore shoulder and neck muscles. She also continued to wear the cervical collar and to take muscle relaxant pills during this time.

Plaintiff returned to Rapid City at the end of November of 1971 and went to work as a check-out operator at the K Mart Store. She continued to suffer periodic spells of stiffness and

soreness in her neck, shoulders and upper back, as well as headaches. During these times she would wear the cervical collar at work.

The plaintiff re-enrolled at the School of Mines and Technology at the beginning of the 1972 spring term. She also continued to work part time at K Mart. Plaintiff started wearing the neck collar to school after she experienced problems with her neck during an engineering graphic course that required her to sit on a high stool over a drafting board for periods of up to three hours at a time.

Because plaintiff continued to suffer pain and discomfort, she was advised by Dr. Blunck to use a traction device at home at night while she slept. Plaintiff was unable to take the pain-killing medication the doctor had prescribed because it interfered with her ability to do her course work at school.

On April 13, 1972, plaintiff was hospitalized for the purpose of a myelogram examination. She was discharged from the hospital on April 17, 1972. Following her release from the hospital, plaintiff remained at home for a week because of the after effects of the myelogram examination which included a worsening of the headache, nausea, and soreness from the spinal injections. All told she missed some two weeks of classes and as a result found it impossible to make up the missed work and to complete the semester. Plaintiff testified that she intended to return to school, possibly during the 1973 spring semester.

In response to the question, "* * * do you have an opinion based upon reasonable medical certainty as to whether or not she [plaintiff] will continue to suffer discomforts and difficulties which she had described to you in her neck in the future?", Dr. Blunck testified "* * * I think she will." Again, in response to the question, "* * * do you have an opinion based upon reasonable medical certainty as to whether or not the difficulty which Mrs. Reindl has been experiencing in her neck over this period of time is permanent in nature?" Dr. Blunck testified, "I think it is after a year and a half."

Prior to the accident, plaintiff enjoyed swimming (she was on a local swimming and diving team during high school), water

skiing, snow skiing and horseback riding. From the date of the accident until the time of trial in December of 1972 plaintiff had been snow skiing on one occasion and water skiing on one occasion. She testified that she had water skied only once because she was afraid of being hurt.

Plaintiff testified that she suffers from stiffness and soreness and from headaches once or twice a week and more frequently at times when she works especially hard.

Plaintiff's special damages included medical bills of $1,286.33, property damage in the amount of $775 and lost earnings in the amount of $1,450.

█ Defendant contends that the verdict of $36,000 is excessive and is the product of passion and prejudice, citing Tufty v. Sioux Transit Co., 70 S.D. 352, 17 N.W.2d 700 and Stene v. Hillgren, 77 S.D. 165, 88 N.W.2d 109. In support of this contention, defendant argues that one of plaintiff's attorneys used the so-called "per diem" or mathematical formula argument in his summation to the jury. During that portion of his argument that is in question, plaintiff's counsel, after referring to the fact that plaintiff had a life expectancy of some 55.9 years, stated that plaintiff would continue to suffer discomfort and pain some 50 times a year and argued, "The figures that I have been talking about are if we assume once a week—when we were trying to evaluate this at the office, trying to look at figures, if that is worth to Sherry $750.00 a year—*  *  *". At this point defendant's trial counsel (defendant's present attorney did not try the case) made the following objection:

> "Your Honor, we object to this line of argument; that the jury be instructed to disregard it; that this is not the proper way to determine loss or detriment to so many days, so many hours or so many minutes."

In response to this objection, the trial judge stated "I think they can consider that, but it is a matter—I think you have gone far enough on that, Mr. Clabaugh." Thereafter, plaintiff's counsel did not pursue this line of argument further.

In view of defense counsel's prompt objection, the trial court's ruling and the compliance with that ruling by plaintiff's attorneys, we are of the opinion that the question of the propriety of the "per diem" argument is not before us in this case.

■ With respect to the question of the alleged excessiveness of the verdict, we believe that the following quotation from Ross v. Foss, 77 S.D. 358, 92 N.W.2d 147, is applicable:

> "We think this award a generous one. However, that is immaterial because more than mere generosity must be made to appear before a court is justified in disturbing it. This it may do only if '* * * it is so extremely excessive as to justify the inference or conclusion that it is the product of corruption, passion or prejudice.' Tufty v. Sioux Transit Co., 70 S.D. 352, 17 N.W.2d 700, 702. In this connection the court may consider occurrences in the course of the trial that may have caused the jury to be biased or prejudiced. Stene v. Hillgren, 77 S.D. 165, 88 N.W.2d 109. Our review of this record reveals no occurrences of that type, nor do we consider the verdict so excessive as to warrant an inference or conclusion that it is tainted with corruption, passion or prejudice." 77 S.D. 358, 369, 92 N.W.2d 147, 153.

The record conveys the impression that counsel for both parties tried this case in a dignified, professional manner. There were none of the unseemly clashes between counsel that all too often mar the course of an otherwise orderly trial. Nor do the pages of the record reveal any of the innuendos or questions calling for clearly objectionable answers that pass for clever trial tactics in some quarters. In a word, the case appears to have been tried in a very low-keyed, courteous manner. Apparently the jury believed that plaintiff was being completely forthright and candid in her testimony and must have concluded that in fact she had suffered a painful injury that will be permanent in nature. Viewing the evidence in the light most favorable to plaintiff, as we must, Warwick v. Mulvey, 80 S.D. 511, 127 N.W.2d 433, the jury could very well have concluded that plaintiff is a hardworking, ambitious, non-malingering person who has made every effort to return to her pre-accident

scholastic, vocational and recreational activities. The fact that defendant admitted liability and offered no testimony was probably not without its significance to the jury.

We believe that the following language from Ross v. Foss, supra, is especially pertinent to the facts of this case:

> "There are no accurate means of monetarily evaluating the detriment caused plaintiff by her pain, suffering and discomfort. Of necessity the amount of damages to be awarded therefor is largely left to the good judgment of the jury. Larum v. Butler, 42 S.D. 30, 172 N.W. 778. And when courts scrutinize the exercise of that judgment they must keep in mind the reduced value of our dollar. In passing on the question of whether such award is legally excessive the trial judge exercises a judicial discretion. Because of his participation in the trial he is in a better position than are we to make this determination. * * *" 77 S.D. 358, 369, 92 N.W.2d 147, 153.

See also Tufty v. Sioux Transit Co., supra; Hotovec v. Howe, 79 S.D. 337, 111 N.W.2d 748; Piper v. Barber Transportation Company, 79 S.D. 353, 112 N.W.2d 329.

We cannot say that the damages awarded here are so excessive as to strike us as being beyond all measure unreasonable and outrageous; they do not manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption. Schuler v. City of Mobridge, 44 S.D. 488, 184 N.W. 281. Although the size of the verdict may cause us to raise our eyebrows, it is not so large as to shock our consciences. We do not mean to imply that this verdict is one that should serve as a yardstick by which verdicts in similar neck injury cases are to be measured for adequacy or excessiveness. We hold only that when viewed in the light of all of the evidence, including the factors of clear liability, demonstrated physical injury, at least some of which is of a permanent nature, and plaintiff's physical pain and suffering and emotional distress, the latter no doubt exacerbated by the two forced interruptions in plaintiff's schooling, the verdict is not excessive and the trial court did not err in denying the motion for new trial.

The judgment is affirmed.

All the Justices concur.